## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROGER WILLIAMSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PURDUE PHARMA L.P.,<br>PURDUE PHARMA COMPANY,<br>THE PURDUE FREDERICK COMPANY,<br>PURDUE PHARMACEUTICALS L.P.,<br>and THE P.F. LABORATORIES INC.,<br><br>Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED**<br><br>**04 cv 10154 REK**<br><br>MAGISTRATE JUDGE _Dein_<br><br>RECEIPT #___53355___<br>AMOUNT $___150___<br>SUMMONS ISSUED__5__<br>LOCAL RULE 4.1_____<br>WAIVER FORM _____<br>MCF ISSUED_____<br>BY DPTY. CLK._____<br>DATE___1-23-04__ |

## CLASS ACTION COMPLAINT

Plaintiff, Roger Williamson, individually and, on behalf of himself and all others similarly situated, files this complaint against Defendants, Purdue Pharma L.P., Purdue Pharma Company, The Purdue Frederick Company, Purdue Pharmaceuticals L.P., and The P.F. Laboratories Inc. (hereinafter the "Defendants"), upon personal knowledge as to facts pertaining to himself, and upon information and belief as to all other matters, alleges as follows:

### NATURE OF THE ACTION

1.      This action is brought under the federal antitrust laws to remedy anti-competitive actions by Defendants to delay and prevent generic competition for the prescription drug OxyContin.

2.      OxyContin is an opioid analgesic that is prescribed for the treatment and management of moderate to severe chronic pain. The active ingredient in OxyContin is

00001443.WPD ; 1

oxycodone hydrochloride controlled-release ("Oxycodone hydrochloride c-r"). To date, no competing brand name drug based on oxycodone hydrochloride c-r and no generic version of OxyContin has been marketed in the United States.

3.    OxyContin is manufactured and marketed by Defendants.

4.    Defendants unlawfully obtained and enforced a monopoly for OxyContin and oxycodone hydrochloride c-r through intentional misrepresentations to the U.S. Patent and Trade Mark Office ("PTO"). Defendants obtained a patent for oxycodone hydrochloride c-r and caused it to be listed in the Orange Book (defined below) in a manner that has enabled Defendants to falsely create and extend their market monopoly for OxyContin and oxycodone hydrochloride c-r. Defendants further engaged in sham litigation to unlawfully enforce their patent, although they knew or should have known that the patent was unenforceable. As a result of Defendants' conduct, Plaintiff and the Class (as defined herein) paid and continue to pay millions of dollars for OxyContin at supra-competitive prices that they would save if competing and/or generic versions of OxyContin were available.

5.    This Complaint is brought by Plaintiff on behalf of a Class defined in ¶ 70.

6.    Plaintiff seeks a judgment declaring Defendants' conduct unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2, and, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining the continuation of Defendants' monopolistic practices.

7.    Neither Plaintiff nor the Class seek any relief under Section 4 of the Clayton Act, 15 U.S.C. § 15.

8.    Plaintiff and the Class seek equitable remedies as to Defendants' unjust enrichment.

00001443.WPD ; 1                                      2

## JURISDICTION AND VENUE

9.    The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 22 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) because Defendants are found to transact business, and/or have agents in this district and because the affected trade and commerce described below has been carried out, in substantial part, in this district.

## THE PARTIES

11.    Plaintiff, Roger Williamson, is a citizen of the Commonwealth of Massachusetts who purchased and paid for OxyContin manufactured and sold by Defendants during the Class Period and has been injured by the supra-competitive prices and monopolistic conduct of the Defendants.

12.    Defendant Purdue Pharma L.P. ("Purdue"), is a corporation organized and existing under the laws of the state of Delaware. Its principal place of business is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut. It is engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout the United States. Purdue Pharma L.P. owns the patent for OxyContin tablets.

13.    Defendant Purdue Pharma Company ("Purdue Co."), is a general partnership organized and existing under the laws of the state of Delaware. Its principal place of business is at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut. It is engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout

the United States.  Purdue Pharma and Purdue Frederick are general partners of The Purdue Pharma Company.

14.    Defendant The Purdue Frederick Company ("Frederick Co."), is a corporation organized and existing under the laws of the state of New York.  Its principal place of business is at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut.  It is engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout the United States.

15.    Defendant Purdue Pharmaceuticals L.P. ("Purdue Pharmaceuticals"), is a corporation organized and existing under the laws of the state of Delaware.  Its principal place of business is located at 4701 Purdue Drive, Wilson, North Carolina.  It is engaged in the manufacturing and formulation of medications for pain relief and asthma sold throughout the United States.

16.    Defendant P.F. Laboratories Inc. ("P.F. Labs"), is a corporation organized and existing under the laws of the state of New Jersey. Its principal place of business is located at 700 Union Boulevard, Totowa, New Jersey. It is engaged in the production of pharmaceutical products sold throughout the United States.

17.    The Defendants named in this Complaint are collectively referred to herein as the "Defendants."  Together Defendants manufacture and market OxyContin throughout the United States.

18.    The acts charged in this Complaint as having been done by Defendants were authorized, ordered or done by officers, agents, employees or representatives, while actively engaged in the management of Defendants' business or affairs.  Whenever any reference is made

in this Complaint to any corporate Defendant, such reference shall be deemed to include predecessors, successors, parents, subsidiaries, affiliates and divisions of the corporation.

## TRADE AND COMMERCE

19.    At all relevant times, OxyContin was manufactured by Defendants and was thereafter sold, shipped and transported across state lines to United States customers located outside the state of manufacture.

20.    During the Class Period, in connection with the purchase and sale of OxyContin, monies, as well as contracts, bills, and other forms of business communications and transactions, were transmitted in a continuous and uninterrupted flow across state lines.

21.    During the Class Period, various means and devices were used to effectuate the Defendants' actions alleged herein, including the United States mail, interstate travel, interstate telephone commerce, and other forms of interstate electronic communications. The activities of Defendants alleged herein were within the flow of and have substantially affected, interstate commerce.

## RELEVANT MARKET

22.    To the extent applicable to the claims alleged herein, the relevant product market is the market for the manufacture and sale of oxycodone hydrochloride c-r, including OxyContin and all generic bioequivalents rated "AB" by the United States Food and Drug Administration ("FDA"). The relevant geographic market is the United States and its territories as a whole. At all relevant times up to and including the present, Defendants' market share in the relevant product and geographic market was 100%.

23.    Defendant Purdue developed and patented OxyContin as the "first and only 12-

00001443.WPD ; 1                    5

hour oxycodone analgesic." OxyContin contains oxycodone hydrochloride c-r, a very strong narcotic pain reliever similar to morphine. OxyContin and generic oxycodone hydrochloride c-r products are not reasonably interchangeable with other analgesics. It is available in 10mg, 20mg, 40mg, 80mg and 160mg. OxyContin has been approved for the treatment of moderate to severe pain, which requires treatment for more than a few days, such as pain associated with musculoskeletal conditions. OxyContin provides a way for patients suffering from chronic pain to get a full night's sleep due to it's controlled-release formulation. OxyContin provides relief for a full twelve hours while other analgesics are often effective for only four to six hours.

## FACTUAL ALLEGATIONS

24.    The manufacture, marketing, distribution and sale of prescription drugs is one of the most profitable industries in the United States. The U.S. market accounts for more than 40% of the world's prescription pharmaceutical revenues. The cost of prescription drugs in the United States has been rising at a rate of 14% to 18% per year, and the cost of drugs dispensed in the United States for the year 2001 was between $160 billion and $170 billion.

### Brand Name Drugs - Generic Drugs

25.    Under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq.*, (the "FFDCA") approval by the FDA is required before a new drug can be manufactured and sold.

26.    Approval for a new drug, often referred to as a "pioneer drug," must be sought by filing a New Drug Application ("NDA") with the FDA demonstrating that the drug is safe and effective for its intended use.

27.    In addition to information on safety and efficacy, NDA applicants must submit to the FDA a list of all prior art, as well as patents that claim the drug for which FDA approval is

being sought, or that claim a method of using the drug, and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug. When the NDA is approved, the FDA "shall publish" the patent information submitted for the NDA applicant.

28.    New drugs that are approved for sale in the United States by the FDA are often covered by patents and marketed under a brand name.

29.    Generic drugs, which must also be approved by the FDA, have the same active chemical composition and provide the same therapeutic effects as the pioneer drugs upon which they are modeled.

30.    The FDA will assign an "AB" rating to generic drugs that are bioequivalent to pioneer or brand name drugs.

31.    When a physician writes a prescription for a brand name drug, such as OxyContin, that prescription defines and limits the market to the drug named and its AB-rated generic equivalents.

32.    A generic drug which carries the FDA's "AB" rating may (and often must) be substituted by a pharmacist for a physician's prescription for the brand name drug, unless the physician has specifically indicated on the prescription "dispense as written" or "DAW" (or similar indications, the wording of which varies from state to state).

33.    When an AB-rated generic formulation of a brand name drug is available, the pharmacist will: (a) substitute the generic drug for consumers covered by most insurance or benefit plans; or (b) offer cash-paying consumers the choice of purchasing the AB-rated generic at a lower price.

34.    Generic drugs are normally priced substantially below the brand name drugs to which they are bioequivalent. The Federal Trade Commission ("FTC") estimates that the first generic drug to enter the market is typically between 70% and 80% of the price of the brand-name drug.

35.    A brand name drug loses a significant portion of its market share to generic competitors soon after the introduction of generic competition, even if the brand name manufacturer lowers its prices to meet competition.

36.    The average price of a brand name drug facing generic competition is often less than the average price of a brand name drug without generic competition.

### The Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act")

37.    In 1984, Congress enacted the Hatch-Waxman Act to establish an abbreviated process to expedite and facilitate the development and approval of generic drugs.

38.    The Hatch-Waxman Act permits a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") that incorporates by reference the safety and effectiveness data developed and previously submitted in the NDA process by the company that manufactured the pioneer drug.

39.    The FDA maintains and publishes *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book"), which lists all prescription drugs approved for use in the United States and the patents, if any, covering those drugs.

40.    For each patent applicable to the pioneer drug listed in the Orange Book, an ANDA applicant must certify whether the proposed generic drug would infringe that patent and,

if not, why not in accordance with FFDCA Section 355(j)(2)(A)(vii).

41.    An ANDA filer must make one of four certifications in accordance with FFDCA Section 355(j)(2)(A)(vii):

    a.    That no patent for the pioneer drug has been filed with the FDA (a "Paragraph I Certification");

    b.    That the patent for the pioneer drug has expired (a "Paragraph II Certification");

    c.    That the patent for the pioneer drug will expire on a particular date and the generic company does not seek to market its generic product before that date (a "Paragraph III Certification"); or

    d.    That the patent for the pioneer drug is invalid or will not be infringed upon by the proposed generic company's product (a "Paragraph IV Certification").

42.    If an ANDA includes a Paragraph IV Certification, the applicant must notify the pioneer drug patent owner of the certification. The notice must include a detailed statement of the factual and legal basis for the ANDA applicant's assertion that the patent is not valid or will not be infringed by the generic products.

43.    Upon receiving notification of a Paragraph IV Certification, the pioneer drug patent owner has 45 days under the Hatch-Waxman Act to initiate a patent infringement lawsuit against the ANDA application (the "45 day window"). If no lawsuit is initiated during the 45 day window, the process for FDA approval of the generic product continues.

44.    If a patent infringement suit is commenced within the 45 day window, FDA approval of the ANDA is automatically stayed until the earliest of: (a) the expiration of the patent; (b) the expiration of 30 months from the patent holder's receipt of notice of the Paragraph IV Certification (the "30 month stay"); or (c) a final judicial determination of non-infringement or patent invalidity.

45.    The first filer of an ANDA with a Paragraph IV Certification is eligible for a 180-day period in which to market its generic version on an exclusive basis (the "180-day exclusivity period").

46.    The 180-day exclusivity period is triggered by either: (a) commercial marketing of the generic product, or (b) a final court decision that the patent at issue is either invalid or not infringed.

47.    If a patent is listed in the Orange Book, the pioneer drug patent holder need only file a patent infringement lawsuit within the 45 day window in order to block FDA approval of an ANDA applicant's generic drug from entering the market for up to 30 months.

**Intentional Misrepresentations to the United States Patent Trademark Office and Sham Litigation By Defendants to Obtain and Maintain an Improper Monopoly for OxyContin and Oxycodone Hydrochloride**

48.    Defendants are the owner of Patent No. 5,549,912 (the "'912 Patent"), Patent No. 5,508,042 (the "'042 Patent") and Patent No.5,656,295 (the "'295 Patent"), which are respectively, a continuation-in-part, divisional application and continuation-in-part of Patent No. 5.266,331 (the "'331 Patent"), purported to cover the chemical compound oxycodone hydrochloride (the '912 patent, the '042 patent and the '295 patent are collectively referred to herein as the "Patents"). Pursuant to NDA No. 20-553, Defendants have marketed OxyContin, whose active ingredient is oxycodone hydrochloride c-r, in the United States and elsewhere since the drug received FDA approval in December, 1995.

49.    Endo Pharmaceuticals Inc. and Endo Pharmaceuticals Holdings ("Endo"), are manufacturers of generic pharmaceutical products. In July 2000, Endo filed ANDA No. 75-923 with the FDA to market generic versions of OxyContin in the 40 mg strength. On February 9,

2001 Endo amended its ANDA application to include the 10mg and 20mg strengths of oxycodone hydrochloride c-r and on July 30, 2001 Endo's ANDA was amended to include the 80 mg strength.

50.    After the initial ANDA application and each subsequent amendment thereto, Endo gave written notice ("notice of certification") to Defendants, pursuant to 21 U.S.C. § 355(j)(2)(B)(i) and (ii), that its ANDAs and the accompanying certification had been filed with the FDA. In accordance with 21 U.S.C. § 355(j)(2)(B)(ii), the notices also set forth the legal and factual bases for their claims that the '912, '042 and '295 patents are invalid and/or unenforceable.

51.    Within forty-five days of receipt of the notice of certification, Defendants brought suit for patent infringement (hereinafter referred to collectively as the "Infringement Action") in the U.S. District Court for the Southern District of New York. Defendants alleged that Endo's submission of ANDA No. 75-923 violated claims of the '912, '042 and '295 patents. The filing of the Infringement Action resulted in an automatic 30-month stay of the FDA's authority to grant final marketing approval to Endo under its ANDA for oxycodone hydrochloride. The FDA cannot grant final marketing approval to Endo's ANDA until they prevail in the Infringement Action or until at least 30 months expire, whichever is sooner.

52.    Endo filed counterclaims to the Infringement Action, claiming that the '912, '042 and '295 patents were invalid, unenforceable and/or not infringed by its formulation of oxycodone hydrochloride c-r tablets, 10mg, 20mg, 40mg and 80mg. Endo also counterclaimed for antitrust damages because Defendants breached its duty of candor to, and engaged in inequitable conduct before, the PTO and claimed that Defendants asserted their right in the

Patents while aware that the Patents were unenforceable.

53.    To win its patents, Purdue deliberately represented to the PTO that OxyContin adequately controlled pain for approximately 90 percent of chronic pain patients within a four-fold dosage range.

54.    Both before and after the Patents were issued, Defendants knew that the Patents were not enforceable because Defendants and their representatives had knowingly made material misrepresentations to the PTO in connection with the prosecution of the Patents.

55.    Despite this knowledge, Defendants commenced, prosecuted, and maintained the sham Infringement Action against Endo and defended against their counterclaim suits for the improper purpose of maintaining a monopoly in the Relevant Market, and to conceal by deceit that unlawful interference and monopoly maintenance.

56.    Defendants continued to maintain the sham *Orange Book* listing, the Infringement Action, and their sham defenses of the counterclaim suits knowingly, intentionally, affirmatively, with the purpose of unlawfully maintaining their monopoly in the Relevant Market, and with the effect of affirmatively and continuously foreclosing the Generic Manufacturers and any other competitors from the Relevant Market.

57.    On July 31, 2002, the FDA granted "tentative" approval to Endo's ANDA No. 75-923 for Oxycodone hydrochloride c-r Tablets, 10 mg, 20 mg, 40 mg and 80 mg. By granting "tentative" approval, the FDA determined that all the criteria for ANDA "final" approval had been satisfied except for the resolution of issues relating to patents.

<u>**Federal Court Ruling Invalidating the *'912, '042* and *'295* Patents**</u>

58.    A bench trial commenced on June 2, 2003, between Defendants and Endo.

On January 5, 2004, Judge Sidney H. Stein held that the '912, '042 and '295 patents were unenforceable because of Defendants inequitable conduct before the PTO.

59.    During the trial, Dr. Robert F. Kaiko, OxyContin's inventor, acknowledged that he had no "scientific proof" at the time to support Purdue's claim that the drug was effective in low dosages for 90 percent of patients.  Purdue admitted that Dr. Kaiko's "discovery" was not supported by evidence or clinical studies but asserted that it was a result of "insight."  However, testimony at trial revealed that as of 1993, Purdue executives concluded that the company's representations to the P.T.O "weren't anywhere close" to being proved and were "clearly Bob Kaiko's vision."

60.    It was further disclosed at trial that:

> . . . more than a year after representing to the PTO that a four-fold range of dosages was a "surprising discovery," internal memoranda reveal that Dr. Kaiko considered his "surprising discovery" only a non-qualified "expectation" that needed additional studies and supporting data.

61.    As such, the Court found that:

> . . . any good faith belief that Purdue had "discovered" the reduction in dosage range is substantially undercut by its admitted inability to prove, or even develop, a "set of procedures and methods" to prove this reduction in dosage range (and related ease of titration), and cannot "overcome an inference of intent to mislead."

> . . .The record as a whole reflects a clear pattern of intentional misrepresentation of a material fact – Purdue knew that it did not have "scientific proof" of its "discovery," yet repeatedly asserted its "discovery" to the PTO in precise, quantified, past-tense language...

> . . . Purdue committed inequitable conduct before the PTO during the prosecution of the '331, '912, '295 and '042 patents, the patents in suit – the '912, '042 and '295 patents – are rendered unenforceable.

Opinion and Order, *Purdue Pharma L.P., et al., v. Endo Pharmaceuticals, Inc., et al., supra*, 2004 WL 26523 (S.D.N.Y. Jan. 5, 2004).

62.     Throughout the course of the proceedings before the PTO and for much of the litigation of the Infringement Action, Defendants knowingly, willfully and fraudulently concealed the true facts about their misrepresentations to the PTO in order to wrongfully obtain the *'912, '042* and *'295* patents and to wrongfully prevent and discourage lawful competition with their brand name product OxyContin, in the manner more specifically described herein. This fraudulent concealment prevented Plaintiff and the Class from learning of Defendants' illegal conduct or that they had been harmed by such conduct.

### The Effects of Defendants' Anti-Competitive Conduct on the United States Market for OxyContin

63.     The purpose of Defendants' anti-competitive conduct was to obtain and maintain monopoly power in the market for OxyContin and its generic equivalents.

64.     Defendants have succeeded in obtaining this unlawful market power.

65.     With this monopoly power, Defendants have fixed prices for OxyContin at artificially high and supra-competitive levels.

66.     Due to Defendants' monopolization, horizontal competitors and potential horizontal competitors were restrained and denied the opportunity to market competing products, which would be marketed at prices substantially lower than the costs of OxyContin.

67.     Defendants have engaged in monopolistic practices concerning OxyContin to avoid a loss in market share and revenues that would result following generic competition for OxyContin.

68.     As a result of Defendants' anti-competitive conduct, Plaintiff and the Class have been financially injured. First, Plaintiff and the Class have never had the opportunity to pay for lower-cost generic versions of OxyContin. Second, while Defendants have maintained their monopoly for OxyContin and its generic equivalents, Plaintiff and the Class have been paying and reimbursing and continue to pay and reimburse supra-competitive and artificially high prices for OxyContin.

69.     Defendants had and have no legitimate justification, economic or otherwise, for committing the violations of law alleged herein.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, specifically Rule 23(b)(2) for declaratory and equitable relief sought herein, on behalf of persons resident in the United States, as a representative of the Class as defined as follows:

> All persons or entities throughout the United States and its territories who purchased and/or paid for OxyContin or generic versions of OxyContin during the period December 1995 to the present ("the Class Period") for consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries (the "Class").

Excluded from the Class are all Defendants, their officers, subsidiaries and affiliates, all government entities, and all persons or entities that purchased OxyContin (a) for purposes of resale, or (b) directly from any of the Defendants or their affiliates.

71.     The members of the Class are so numerous that joinder of all members is impracticable. The number of persons or entities who purchased and/or paid for OxyContin during the Class Period exceeds one million. The Class members are identifiable, *inter*

*alia*, from information and records that are required by law to be maintained by pharmacies, drugstores and managed care organizations.

72.    Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members, in part because Defendants have acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate equitable, injunctive and declaratory relief with respect to the Class as a whole. Such conduct is the Defendants' exclusionary and anti-competitive efforts to mislead the PTO, and file sham litigation for the sole purpose of monopolizing and attempting to monopolize the market for OxyContin.

73.    Among the questions of law and fact common to the Class are:

a.    Whether Defendants '912, '042 and '295 patents are unenforceable based on Defendants' material misrepresentations to the PTO.

b.    Whether Defendants have unlawfully monopolized or attempted to monopolize the market for OxyContin and its generic equivalents;

c.    Whether Defendants possessed and/or unlawfully extended their monopoly power over the market for OxyContin and its generic equivalents;

d.    Whether Defendants have fixed, raised or maintained the prices of OxyContin at supra-competitive and artificially high prices;

e.    Whether Defendants engaged in sham litigation for the purpose of preventing competition;

f.    Whether the Class suffered and continues to suffer antitrust injury; and

g.    Whether Defendants were and continue to be unjustly enriched to the

detriment of the Class, entitling Plaintiff and the Class to disgorgement of all monies resulting therefrom.

74.    Plaintiff's claims are typical of the Class because he and all members of the Class were injured and continue to be injured in the same manner by Defendants' unlawful, anti-competitive and inequitable methods, acts and practices, and wrongful conduct complained of herein, *i.e.*, they have paid supra-competitive and artificially high prices for OxyContin and will continue to be forced to do so until the markets for OxyContin and its generic equivalents are competitive and prices have stabilized to competitive levels.

75.    Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel who are experienced in antitrust class action litigation. Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

76.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

77.    Plaintiff knows of no difficulty to be encountered by litigating this action that would preclude its maintenance as a class action.

## COUNT I

### FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTION 2 OF THE SHERMAN ACT

78.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though

set forth herein.

79.     Section 2 of the Sherman Act provides in pertinent part that:

> Every person who shall monopolize, or attempt to monopolize, or
> combine or conspire with any other person or person to
> monopolize any part of trade or commerce among the several
> states, or with foreign nations, shall be deemed guilty of a felony ...
> 15 U.S.C. § 2

80.     Defendants knowingly and willfully engaged in a course of conduct designated to

improperly obtain and extend their monopoly power in the Relevant Market. This course of

conduct included, *inter alia*, the following acts: (i) the intentional submission of fraudulent

statements to, and omissions of material facts from, the PTO; (ii) the prosecution of baseless,

sham patent litigation against generic competitors; and (iii) maintaining sham defenses of the

counterclaims by Endo. The result of Defendants' unlawful conduct has been to obtain and

extend their monopoly in the relevant markets for OxyContin and its bioequivalents.

81.     Defendants' Infringement Action constitutes sham litigation, in that the suit was

objectively baseless in that Defendants' motivation in bringing the action was to directly

interfere with the ability of Endo and other generic competitors to market less expensive generic

versions of OxyContin that would compete with the brand-name product.

82.     Defendants intentionally and wrongfully created and maintained a monopoly

power in the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

83.     Plaintiff and the other members of the Class have been injured in their business or property by reason of Defendants' antitrust violation alleged in this Count. Their injury consists of being deprived of the ability to purchase less expensive, generic versions of OxyContin, and paying higher prices for oxycodone hydrochloride c-r products than they would have paid in the absence of the antitrust violation. The injury to Plaintiff and the Class is the type of injury antitrust laws were designed to prevent, and the injury flows from Defendants' unlawful conduct

84.     Plaintiff and the Class, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 18 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition through the use of the invalid *'912, '042* and *'295* patents violates Section 2 of the Sherman Act.

85.     Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anti-competitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anti-competitive conduct does not occur in the future.

## COUNT II

### FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT BY DEFENDANTS

86.     Plaintiff repeats and realleges the preceding paragraphs as though set forth herein.

87.     Defendants have benefitted from the monopoly profits of their sale of OxyContin resulting from their unlawful and inequitable acts alleged in this Complaint.

88.     Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to Plaintiff's and the Class' overpayments for OxyContin.

00001443.WPD ; 1                                    19

89.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

90.    The economic benefit of overcharges and monopoly profits derived by Defendants by charging supra-competitive and artificially high prices for OxyContin is a direct and proximate cause of Defendants' unlawful practices.

91.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anti-competitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

92.    It would be inequitable for Defendants to be permitted to retain any of the unlawful proceeds resulting from the intentional submission of false patent information in the *Orange Book*, the intentional submission of fraudulent statements to and concealment of material facts from the PTO, the commencement or maintenance of sham patent infringement lawsuits, and the maintenance of baseless defenses to counterclaims.

93.    It would be inequitable for the Defendants to be permitted to retain any of Plaintiff's or the Class' overpayments for OxyContin derived from Defendants' unlawful conduct alleged in this Complaint.

94.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by them.

95.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

00001443.WPD ; 1                              20

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

a.    Certifying the Class pursuant to the Federal Rules of Civil Procedure, certifying Plaintiff as the representative of the Class, and designating his counsel as counsel for the Class;

b.    Declaring that Defendants' commencement and/or maintenance of patent conduct as alleged herein declared, adjudged, or decreed to be unlawful monopolization in violation of §2 of the Sherman Act;

c.    Enjoining and restraining Defendants' continuing violations of §2 of the Sherman Act, pursuant to §16 of the Clayton Act;

d.    Granting Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

e.    Granting Plaintiff's and the Class' costs of prosecuting this action, together with interest and reasonable attorneys' fees, experts' fees and costs; and

f.    Granting such other relief as this Court may deem just and proper.

## JURY DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated:  January 23, 2004

Respectfully submitted,

David Pastor, Esq. (BBO #391000)
Daniel D'Angelo, Esq. (BBO #630321)
GILMAN AND PASTOR, LLP
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Telephone: (781) 231-7850

**ATTORNEYS FOR PLAINTIFF**